**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEKSANDR OKULOV**<br>    Shoreline 10 app 610 Plan Jumeirah,<br>    Dubai, United Arab Emirates<br><br>    *Plaintiff,*<br><br>    **V.**<br><br>**LISA PALLUCONI**<br>    **in her official capacity as Acting**<br>    **Director of the United States**<br>    **Department of the Treasury**<br>    **Office of Foreign Assets Control**<br>    1500 Pennsylvania Avenue, N.W.<br>    Freedman's Bank Building<br>    Washington, D.C. 20220<br><br>**and**<br><br>**THE UNITED STATES DEPARTMENT**<br>**OF THE TREASURY, OFFICE OF**<br>**FOREIGN ASSETS CONTROL**<br>    1500 Pennsylvania Avenue, N.W.<br>    Freedman's Bank Building<br>    Washington, D.C. 20220<br><br>    *Defendants.* | **CASE NO.**<br><br>**JURY TRIAL: NO** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Aleksandr Okulov ("Mr. Okulov") brings this Complaint for Declaratory and

Injunctive Relief against Defendants, the United States Department of the Treasury's Office of

Foreign Assets Control ("OFAC"), and its Acting Director, Lisa Palluconi (collectively, the

"Defendants") and in support of his complaint alleges:

**Introduction**

1.      Mr. Okulov brings this lawsuit to dispute Defendants' unwarranted designation of him as a Specially Designated National ("SDN") and Defendants' prolonged failure to adjudicate his request for recission of the designation.  On April 20, 2022, Mr. Okulov was sanctioned pursuant to Executive Order 14024 of April 15, 2021 ("E.O. 14024"), as part of the Biden Administration's campaign to curb Russian aggression against Ukraine.

2.      OFAC's publicly stated rationale for sanctioning Mr. Okulov was his alleged connection to SDN Konstantin Malofeyev ("Malofeyev") and the Autonomous Noncommercial Organization for the Study and Development of International Cooperation in the Economic Sphere International Agency of Sovereign Development ("IASD").[1]  The press release announcing Mr. Okulov's designation stated that Malofeyev relied on Mr. Okluov who, "[as] a member of IASD's supervisory board, traveled to Africa as part of IASD delegations with  Malofeyev" and who "is associated with several companies located in the Middle East."[2]  No other basis for the designation was provided.  Several of Mr. Okulov's companies, Lider Asig, Lider Leasing, OKAF Trading, and Project Invest (together, the "Sanctioned Companies"),  were also sanctioned for being owned or controlled by, or for having acted, or purported to act, on his behalf.[3]

3.      Malofeyev was sanctioned in 2014 for allegedly providing material assistance to Russian separatists in Crimea[4] and again in 2022, for allegedly supporting pro-Russian activities

---

[1] Office of Foreign Assets Control, Notice of OFAC Sanctions Actions (Apr. 26, 2022), *available at:* https://www.federalregister.gov/documents/2022/04/26/2022-08821/notice-of-ofac-sanctions-actions.
[2] U.S. Department of the Treasury, Press Release, "U.S. Treasury Designates Facilitators of Russian Sanctions Evasion," (Apr. 20, 2022), *available at* https://home.treasury.gov/news/press-releases/jy0731.
[3] *Id.*
[4] U.S. Department of the Treasury, Press Release, "Treasury Targets Additional Ukrainian Separatists and Russian Individuals and Entities," (Dec. 19, 2014), *available at* https://home.treasury.gov/news/press-releases/jy0954#:~:text=WASHINGTON%20%E2%80%93%E2%80%93%20Today%2C%20as%20part,the%20Government%20of%20the%20Russian.

in various countries.[5]    Malofeyev allegedly operates through the IASD, which was also

sanctioned.[6]

4.    Regardless of the allegations against Malofeyev, Defendants' stated justifications

for the sanctions on Mr. Okulov are without merit.  Mr. Okulov has no ties to Russia.  He was born

in the former Soviet Union, in the Soviet Socialist Republic of Moldova.  He grew up in Moldova,

went to school in Moldova, and started various business ventures in Moldova.  He currently resides

in Dubai with his family, none of whom are Russian citizens.  Mr. Okulov has never lived or

worked in Russia and only has Russian citizenship (which he is in the process of renouncing)

because his parents chose it for him upon the dissolution of the Soviet Union when he was still a

child.  Far from supporting Russian aggression in Ukraine, Mr. Okulov has made charitable

contributions consisting of clothing, medicine, and used cars to the City of Kramatorsk in eastern

Ukraine, which has suffered severe damage as a result of the Russian invasions in 2014 and 2022.

5.    Although Mr. Okulov acknowledges that he (unsuccessfully) sought funding from

Malofeyev to support legitimate business ventures unconnected to Russian foreign policy, he

denies that he ever participated in any political activities with Malofeyev or the IASD, and did not

even understand Malofeyev's political role at the time of their limited and intermittent

acquaintance, between 2019 through 2022.  Neither at the time of his designation, nor at any time

since, have the Defendants cited to any specific activities through which Mr. Okulov ever provided

support to the Russian regime or engaged in sanctions evasion, sanctions circumvention, or any

form of illegal activity.  Defendants cite only to Mr. Okulov's "travel to Africa," purportedly as a

---

[5] *Supra,* n. 2.
[6] *Id.*

representative of the IASD, without ever alleging what he did for the organization beyond travelling to Africa.

6.      Since being designated over three years ago, Mr. Okulov has ceased all contact with Malofeyev, has avoided contact with any other sanctioned individuals, has ceased travel to Africa, has closed the operations of all the Sanctioned Companies, and as noted above, is in the process of renouncing Russian citizenship.

7.      Defendants' stated policy and oft-repeated mantra is that "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."[7]  Furthermore, SDNs may submit arguments or evidence where they believe that "the circumstances resulting in the sanction no longer apply."[8]  In this case, even if there were a sufficient basis for the initial designation (which there was not), Mr. Okulov has exhibited a change in behavior which renders the basis for his designation no longer applicable.

8.      There is now nothing more that Mr. Okluov can do to change the circumstances that resulted in the sanctions.  Accordingly, far from furthering U.S. policy in Ukraine, the continued sanctions on Mr. Okulov send a counter-productive message – even SDNs who renounce Russian citizenship and terminate the relationships that led to their designation will nevertheless remain sanctioned.  Such a message can only undermine the Defendants' policy goal of inducing a change in behavior.

9.       The Defendants are well aware of Mr. Okulov's change of circumstances.  Over one year ago, on June 13, 2024, Mr. Okulov filed an application for recission of the sanctions,

---

[7] *See* U.S. Dep't of the Treasury, *Filing a Petition for Removal from an OFAC List,* https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list.
[8] 31 C.F.R. § 501.807.

explaining that he never had business in Russia, terminated all contact with Malofeyev and is in the process of renouncing Russian citizenship. On June 21, 2024, OFAC sent a detailed questionnaire, to which Mr. Okulov responded on August 27, 2024, reiterating the reasons why rescission is warranted, in addition to answering all of OFAC's questions. Since that time, OFAC has not sent another questionnaire or provided any updates regarding the case. The application has not been adjudicated, and the Defendants have provided no indication as to when a decision might be rendered. Accordingly, Mr. Okulov has been left with no choice but to seek judicial intervention.

## Jurisdiction and Venue

10.    This action arises under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555 and 701 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

11.    This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure. This Court may grant injunctive relief pursuant to Rule 65.

12.    Venue is proper in the District of Columbia as this is the district in which the events giving rise to the Complaint occurred and in which Defendants reside. *See* 28 U.S.C. §§ 1391(b) and (e).

## The Parties

13.    Plaintiff Aleksandr Okulov is a dual citizen of Russia and Moldova. He was born in Moldova in 1981 and only has Russian citizenship because his parents chose it for him upon the dissolution of the Soviet Union in 1991, as he was a minor at the time. He has never lived in

Russia, studied in Russia or operated a business in Russia and is currently in the process of renouncing Russian citizenship. He has been residing in the United Arab Emirates since 2022.

14.    Defendant OFAC is a federal administrative agency of the U.S. Department of the Treasury and is located at 1500 Pennsylvania Ave., NW-Annex, Washington D.C. 20220. OFAC is lawfully responsible for administering U.S. economic sanctions programs, including by designating persons under E.O. 14024. Further, under 31 C.F.R. Parts 501 and 587, the "Reporting, Procedures and Penalties Regulations" and the "Russian Harmful Foreign Activities Sanctions Regulations," respectively, it is the sole administrative agency responsible for the reconsideration and delisting process.

15.    Defendant Lisa Palluconi is the Acting Director of OFAC. Acting Director Palluconi is sued in his official capacity.

<b><u>Factual Allegations</u></b>

**A.    Mr. Okulov's Early Life and Businesses**

16.    Mr. Okulov was born in 1981 in the Soviet Socialist Republic of Moldova. Upon the breakup of the Soviet Union, all citizens of the Soviet Socialist Republics were offered Russian citizenship. When the Soviet Union collapsed, Mr. Okulov was only ten years old, and his parents chose dual citizenship - Moldovan and Russian - for him even though the family was living in Moldova. Mr. Okulov never moved to Russia, never lived in Russia, never studied in Russia, and never operated a business in Russia.

17.    Mr. Okulov grew up in Moldova, where he attended school through graduate school and trained as a freestyle wrestler. Apart from a few years spent in Europe to participate in sports clubs, and until he moved to the United Arab Emirates in 2022, Mr. Okulov always resided in Moldova.

18.     Mr. Okulov is an entrepreneur who has started a number of businesses. His companies export products and services from developed economies (like Germany) and import them into emerging markets, primarily in Africa and Moldova.  None of his businesses was ever incorporated in Russia and none ever did business in Russia.  Lider Leasing, was formed in 2011 and sold German-manufactured automobiles in Moldova.  Lider Asig, formed in 2010, provided insurance for the automobiles, specifically for those sold by Lider Leasing.  In 2017, he started his primary business, OKAF Org (which was later renamed ProGlobal and ultimately OKAF Trading), which sought diverse opportunities across various industries in emerging markets.  For example, among other projects, OKAF Trading purchased fabrics in China and resold them in Moldova, supplied police uniforms in Moldova, and constructed houses for customs agents in Guinea.  In 2020, Mr. Okulov also established a real estate venture in Moldova called Project Invest.

19.     Because each company was formed for the purpose of a single venture, each of the companies transacted limited business.  These companies were startups, and, at most, had only three employees, other than Mr. Okulov, who handled the majority of the administrative functions of these companies himself.

20.     Lider Asig, Lider Leasing, OKAF Trading, and Project Invest were also designated by OFAC and, as further discussed in paragraph 28 below, Mr. Okulov has since closed all of their operations.

**B.      Mr. Okulov's Intermittent and Limited Interactions with Malofeyev and the IASD**

21.     Between 2017 and 2022, Mr. Okulov was networking extensively to find business opportunities in Africa for OKAF Trading.  He traveled to the continent at least 15 times between 2009 and 2022 and had over a hundred meetings with potential investors and/or contacts who might be able to introduce him to potential investors.  Mr. Okulov is not a lawyer, and did not have

any connection to the United States, and thus never had a reason to know the details of OFAC's sanctions. His businesses were small, and did not have many resources, so Mr. Okulov did not conduct in-depth screening of his contacts and did not always have a full understanding of the backgrounds of the individuals whom he encountered.

22.     Mr. Okulov first met Malofeyev through a mutual contact at a business conference in Africa in 2019. Mr. Okulov did not know that Malofeyev would be attending the forum and was spontaneously introduced to him. Malofeyev was presented as an active investor who provided capital to aspiring entrepreneurs. The conversation was brief, politics was not discussed, and no business resulted from this meeting. A few months later, Mr. Okulov unexpectedly and briefly encountered Malofeyev at the Russia-Africa Summit in Sochi. Again, politics was not discussed and no business resulted from this brief meeting. Mr. Okulov's third and final meeting with Malofeyev occurred at the end of 2021. They were both in Guinea at the same time, for independent reasons. Mr. Okulov arranged a meeting and pitched an idea for a business project that he was working on at the time. As at the previous meetings, they did not discuss politics and no business resulted from this meeting.

23.     Mr. Okulov does not recall any other meetings with Malofeyev and OFAC has not identified or inquired about any other specific meetings. Mr. Okulov never received any funding from Malofeyev, never provided Malofeyev with any funding, and the two never entered into any business transactions. Malofeyev was Mr. Okulov's only connection to the IASD. Mr. Okulov did not participate in, or even understand, the scope of the activities of the IASD, much less serve in any "supervisory board" capacity.

24.     During their brief acquaintance, Mr. Okulov posted a few photos of himself with Malofeyev on social media at the conference in Africa in 2019 (described in paragraph 24 above),

mistakenly thinking that showcasing himself with potential investors would help build his business.  These posts likely created the incorrect impression that Mr. Okulov had extensive business dealings with Malofeyev.

### C.    Mr. Okulov's Change of Circumstances

25.    Since being sanctioned, Mr. Okulov has cut off all contact with Malofeyev and has not had any contact with any other SDNs.

26.    Mr. Okulov has also liquidated all of the Sanctioned Companies.  Lider Leasing, OKAF Trading, and Project Invest all entered liquidation on February 2, 2024.  Lider Asig entered liquidation on April 11, 2025.  The process of closing Lider Asig took longer because it had a creditor and needed to go through a  formal bankruptcy process.

27.    On March 15, 2024, Mr. Okulov began the process of renouncing Russian citizenship (which is time-consuming and difficult due to extensive and complicated Russian regulations).

28.    Mr. Okulov currently resides in Dubai under a residential visa, with his wife and two children, none of whom hold Russian citizenship.  For the last five years, he has been employed as a pharmaceutical consultant.

29.    As a result of the sanctions, Mr. Okulov's bank accounts have been frozen, making it impossible for him to engage in routine business transactions.  Furthermore, his reputation has been severely damaged, making it difficult for him to find new business partners.  For example, in 2019, while living in Dubai, he opened another company, OKAF Local Resources, which was going to be a mining business.  However, this company failed as a result of the sanctions.

**D.      The Sanctions on Mr. Okulov Undermine U.S. Policy Goals**

30.     IEEPA endows the President of the United States with certain powers to deal with an unusual and extraordinary threat to national security upon declaration of a national emergency. 50 U.S.C. § 1701.  These powers include the power to impose economic sanctions on foreign entities and individuals. *See* 50 U.S.C. §§ 1702 – 1703.  On April 15, 2021, President Biden issued E.O. 14024, which authorized the imposition of discretionary sanctions on various sectors of the Russian economy, and also granted the Secretary of the Treasury, in consultation with the Secretary of State, and the Secretary of State, in consultation with the Secretary of the Treasury, the power to designate persons determined to meet certain criteria.  E.O. 14024 also authorizes the Secretary of the Treasury to determine additional sectors of the Russian economy to be subjected to the imposition of discretionary sanctions.  E.O. 14024 § l(a).  Pursuant to this authority, OFAC, as a division of the Department of the Treasury, has designated certain persons, including Mr. Okulov.

31.     The intent behind the sanctions was made clear upon issuance. In E.O. 14024, President Biden declared a national emergency to address the following "Specified Harmful Foreign Activities of the Government of the Russian Federation":

a.      undermining the conduct of free and fair democratic elections and democratic institutions in the United States and its allies and partners;

b.      engaging in and facilitating malicious cyber-enabled activities against the United States and its allies and partners;

c.      fostering and using transnational corruption to influence foreign governments;

d.      pursuing extraterritorial activities targeting dissidents or journalists;

e.    undermining security in countries and regions important to United States national

security; and

f.    violating well-established principles of international law, including respect for the

territorial integrity of states.

32.    It is not clear why OFAC believes that Mr. Okulov played a meaningful role

in Malofeyev's operations or the IASD.  On June 17, 2025, OFAC provided a courtesy document

that "identif[ied] unclassified information underlying . . . Mr. Okulov's designation pursuant to

Executive Order 14024."  The document, which is attached as **Exhibit A** is two pages long, and

24 out of the 26 sources cited are redacted.  The only two visible entries are an unexplained citation

to E.O. 14024, with no attempt to connect it to Mr. Okluov, and a link to a 2021 article published

by Africa Intelligence, attached hereto as **Exhibit B**. [9]

33.    The Africa Intelligence article contains no mention of any connection to

Malofeyev or the IASD.  Rather, it discusses Mr. Okulov's provision of medicine to pharmacies

in the Central African Republic, his plans to open a medical laboratory in the capital city of Bangui,

and his plans to develop agricultural and mining projects in Guinea Bissau.  It also states

incorrectly that Mr. Okulov's company supplied the Russian Sputnik vaccine to a number of

African countries (in fact, it was a different company unconnected to Mr. Okulov) and that Mr.

Okulov provided uniforms and equipment to police and armed forces in unidentified countries (in

fact he only provided uniforms and police equipment in Moldova).  However, even if they were

accurate, none of the allegations in the article would constitute "Specified Harmful Foreign

Activities" enumerated by E.O. 14024.

---

[9] On November 13, 2024, Plaintiffs each requested the full administrative record through the Freedom of Information Act.

## Causes of Action

### Count I:
### Defendants' Ongoing Designation of Mr. Okulov Violates the APA because it is Arbitrary and Capricious, and Runs Counter to the Evidence

34.     Mr. Okulov re-alleges and incorporates by reference, as if fully set forth herein, the allegations in all preceding paragraphs.

35.     Under the APA, courts must "hold unlawful and set aside any agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).  Although the scope of review under the arbitrary and capricious standard is narrow, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  An agency action is arbitrary and capricious if it has relied on factors which the agency was not intended to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.

36.     Defendants' stated basis for sanctioning Mr. Okulov is that he was on the supervisory board of the IASD, an organization that allegedly engages in sanctions evasion and acts in coordination with the Russian government.  Yet Defendants rely only on conclusory allegations.  They have never proffered any evidence in support of their accusations, nor have they ever cited any specific actions undertaken by Mr. Okulov for the IASD apart from unspecified "travel" to Africa.

37.     Mr. Okulov explained in his delisting petition that he only had three cursory meetings with Malofeyev.  In response, Defendants have offered no response at all.  There can be no rational basis to conclude that this limited and intermittent contact, where politics was not discussed and where no business transactions resulted, amounted to Mr. Okulov performing any

significant role in the activities of the IASD.  Given the absence of any further information linking

Mr. Okulov to the IASD or the "Specified Harmful Foreign Activities" in EO 14024, there is no

reason to believe that sanctioning Mr. Okulov furthers the national security interests of the United

States.  Absent any such connection, his designation is arbitrary and capricious.

## Count II:
### Defendants' Refusal to Rescind Mr. Okulov's Designation is a Violation of the APA Because it is Arbitrary and Capricious and Runs Counter to Their Own Stated Policies

38.     Mr. Okulov re-alleges and incorporates by reference, as if fully set forth herein, the

allegations in all preceding paragraphs.

39.     Under the APA, courts must "hold unlawful and set aside any agency action that is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See*

5 U.S.C. § 706(2)(A).  Although the scope of review under the arbitrary and capricious standard

is narrow, the agency must examine the relevant data and articulate a satisfactory explanation for

its action including a rational connection between the facts found and the choice made.  An agency

action is arbitrary and capricious if it has relied on factors which the agency was not intended to

consider, entirely failed to consider an important aspect of the problem, or offered an explanation

for its decision that runs counter to the evidence before the agency.

40.     There are few guidelines provided to SDNs seeking delisting.  However, one clear

directive, according to Defendants themselves, is that "[t]he ultimate goal of sanctions is not to

punish, but to bring about a positive change in behavior."[10]  OFAC states that "[t]he power and

integrity of . . . [its] sanctions derive not only from its ability to designate and add persons to

sanctions lists, including the Specially Designated Nationals and Blocked Persons List (SDN List),

---

[10] *Supra* n. 7.

but also from its willingness to remove persons from such lists consistent with the law."[11]   By

refusing to delist Mr. Okulov, even though he has ceased the activities that led to his designation,

Defendants are violating a core principle of their own policy and are therefore acting in a manner

that is arbitrary and capricious.

41.    Sanctions based on past conduct may, at times, serve as a deterrent to bad actors

and therefore as a basis for sanctions.  However, designations based on past conduct are still subject

to judicial review under the arbitrary and capricious standard.  Therefore, Defendants must still

articulate a rational basis to conclude that maintaining a designation on the basis of past conduct

furthers the foreign policy goals of the sanctions.  This standard might arguably be satisfied where

the past conduct is especially egregious or is capable of repetition.  However, Defendants do not,

and cannot, make such a showing here, where Mr. Okulov had only limited contact with Malofeyev

which did not involve politics or consummated business transactions,  and, in any event cut all ties

with Malofeyev upon being sanctioned.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court:

A. Set aside Defendants' actions as unlawful and declare and/or order Defendants'
   rescission of Plaintiff's designation under E.O. 14024 and removal of his name from
   OFAC's SDN List;

B. Order Defendants to issue a written, reasoned decision on Plaintiff's pending delisting
   petition;

---

[11] *Id.*

C.  Grant an award to Plaintiff of costs and attorneys' fees under the Equal Access to

    Justice Act, 28 U.S.C. § 2412 *et seq.*, and any other applicable provision of law; and

D.  Such other and further relief as the Court may deem proper.


Dated: July 18, 2025

                                    Respectfully Submitted,


                                    */s/ Thomas A. Firestone*
                                    Thomas A. Firestone (DC Bar: 1500468)*
                                    SQUIRE PATTON BOGGS (US) LLP
                                    2550 M Street, NW
                                    Washington, DC 20037
                                    Telephone: (202) 457-6000
                                    Facsimile: (202) 457-6315
                                    thomas.firestone@squirepb.com

                                    Tamara Rozina**
                                    SQUIRE PATTON BOGGS (US) LLP
                                    1120 Avenue of the Americas, 13th Floor
                                    New York, NY 10036
                                    Telephone: (212) 872- 9800
                                    Facsimile: (212) 872- 9815
                                    tamara.rozina@squirepb.com

                                    *Counsel for Plaintiff*

                                    * LEAD ATTORNEY TO BE NOTICED
                                    ** pro hac vice forthcoming

## CERTIFICATE OF SERVICE

I, Thomas A. Firestone, certify that on July 18, 2025, I caused a copy of the foregoing to be served on all counsel of record.

*/s/ Thomas A Firestone*
Thomas A. Firestone